Cowin, J.
This is an action for injunctive and declaratory relief brought by the plaintiffs, Construction Industries of Massachusetts, Inc. (C.I.M.) and John T. Callahan & Sons, Inc. (Callahan), who seek a preliminary injunction preventing the performance of any further work by the defendants, City of Peabody (City or Peabody) and Charles Construction Co., Inc. (Charles), under a contract awarded by the City to Charles for the construction of a public building project. The project is known as the “New Garage and Office Complex, Public Services, Park, Recreation and Forestry Departments” (the Project or New Garage and Office Complex). The Project is for the construction of a public services garage to house City emergency vehicles.
Pursuant to G.L.c. 149, §44H,[1] Callahan filed a bid protest on February 14, 1997 with the Office of the Attorney General Division of Fair Labor and Business Practices (Attorney General’s Division). The Attorney General’s Division issued a Bid Protest Decision stating that the contract between the City and Charles violates the competitive bidding statute. Charles continues to work on this contract.[2]
STATEMENT OF FACTS
The following undisputed facts appear from the submissions of the parties. In September, 1996, pursuant to G.L.c. 149, §§44A-44H, (competitive bidding statute or public bidding statute), the City solicited and received sealed general bids for the construction of the Project. The City’s estimated cost for the Project was $3,975,000. At the bid opening on October 17, 1996, the bid results were as follows:
Name of General Bidder Base Bid Amount
Charles Construction Co. $6,188,000
Delulis Construction Co. $6,750,000
John T. Callahan Co. $7,200,000
W. T. Rich Co., Inc. $7,650,000
As is apparent, Charles’ bid was more than $2 million higher than Peabody’s estimate. Callahan was the third lowest general bidder.
Four days after the bid opening, Charles’ vice-president met with City representatives to discuss “cost reduction possibilities.” This meeting was for the purpose of reducing the scope of the Project to reduce the Project price. By letter of October 22, 1996, Charles wrote to the City purchasing department proposing a reduction in the scope of the Project work specified in the Project bidding documents to achieve cost reductions to Charles’ bid in the amount of $2,000,000. On November 26, 1996, the City wrote Charles indicating Peabody’s intent to award Charles the Project contract. Peabody’s architect continued to revise Project plans to reflect changes in the work scope as proposed by Charles. Further, Charles undertook design responsibility for the structural steel on the Project. By letter of December 2, 1996, Charles wrote Peabody a chronological sequence of Charles’ Project scope of work and cost reduction proposals.
On January 17, 1997, Peabody and Charles executed an Agreement (the Agreement) in which Charles agreed to construct the New Garage and Office Complex for the sum of $6,188,000. Despite the fact that the Agreement was for $6,188,000, the performance and payment bond (which was required under the General Bid form to be in the sum of 100% of the contract price) was for the amount of $4,230,155. Also executed on January 17, 1997 by Charles and on February 11, 1997 by Peabody was a Project change *624 order (change order) reducing the scope of the Project work and the Project price from $6,188,000 to $4,230,155. This change order deleted ten sections of the Project bidding specifications. Among other things, the change order also incorporated a new structural framing system designed by Charles.
Callahan protested the actions of Charles and Peabody claiming that the post-bid negotiations by them and the resulting changes to the work scope and price of the Project violated the competitive bidding statute. Peabody and Charles maintain that their actions comply with the competitive bidding statute.
DISCUSSION
As a preliminaiy matter, it is necessary to address an issue of standing. G.L.c. 149, §44H provides an administrative procedure before the Department of the Attorney General (formerly the Department of Labor and Industries) to resolve questions about the applicability of the competitive bidding statute to a public bidding contract. The Attorney General (formerly the Commissioner of Labor and Industries) is authorized to institute and prosecute proceedings in the Superior Court to restrain the award and performance of contracts when it is found that such award or performance has resulted in a violation of the competitive bidding statute. In this case, the plaintiff Callahan has complied with the apparent requirement of filing a formal protest with the Attorney General’s Division before seeking judicial relief, see Petricca Construction Co. v. Commonwealth, 37 Mass.App.Ct. 392, 394 (1994), and the Attorney General’s Division rendered a decision in favor of Callahan on April 14. 1997. However, the Attorney General is not the one seeking relief from this Court.
Nevertheless, our cases make clear that a bidder on a contract governed by the competitive bidding statute has standing to challenge the compliance of the awarding authority with the requirements of those sections. See Grande & Son Inc. v. School Housing Committee of North Reading, 334 Mass. 252 (1956). The courts permit the disappointed bidder to seek judicial relief and do not require that the Attorney General (formerly the Commissioner of Labor and Industries) pursue these actions. “[P]arties challenging compliance with the bidding procedures set forth in G.L.c. 149, §§44A-44H need not meet rigid ‘but for’ standing requirements by asserting that if there had been compliance with the statute, they certainly would have been awarded the contract. The challenging party need show only that it possessed the potential to obtain the award. The right to consideration in the event the apparent low bidder is rej ected is the interest protected by the flexible standing requirements of G.L.c. 149, §§44A-44H. [Citation omitted.] If the situation were otherwise, the important role played by individual bidders in securing compliance with the bidding statutes and legislative policy objectives would be diminished.” Modern Continental Construction Company v. Lowell, 391 Mass. 829, 835-36 (1984). See Norfolk Electric Co., Inc. v. Fall River Housing Authority, 417 Mass. 207, 209-11 (1994).
C.I.M. is a nonprofit Massachusetts corporation which serves as the industry association for the contractors, subcontractors and suppliers who perform construction throughout Massachusetts. Given the rule established by Modern Continental Construction Co. Inc. v. City of Lowell, supra, that a pariy challenging a bid specification need only establish that it has the potential to obtain the award, C.I.M. has standing because it is in the public interest to avoid a multiplicity of actions by the individual members of the association and to ensure that the interests of the members as a collective group are fully represented by a pooling of resources. Granting standing to such associations has been held to be clearly within the purpose of Mass.R.Civ.P. 17(a).[3] See Massachusetts Retired Police and Firefighters Association, Inc. v. Retirement Board of Belmont, 15 Mass.App.Ct. 212, 214-15 (1983); Massachusetts Association of Independent Insurance Agents and Brokers, Inc. v. Commissioner of Insurances 373 Mass. 290, 297-98 (1977).[4]
An application to intervene has been filed by the Associated Subcontractors of Massachusetts, Inc. (ASM), Titon Roofing Company, Inc. (Titon) and Beckwith Elevator Company (Beckwith). ASM is a statewide organization of subbidders who bid on public work and Titon and Beckwith are subbidders who filed subbids on the Project. In regard to the standing of the individual subcontractors Titon and Beckwith, our cases hold that a subcontractor that has the right to be considered as a subbidder on a contract for the construction of a public building has standing to challenge the award of a construction contract alleged to violate the competitive bidding statute. Norfolk Electric Co, Inc., v. Fall River Housing Authority, supra, at 208, n.2. ASM, the association of subbidders, has standing for the reasons stated above regarding C.I.M.., the association of contractors. Accordingly, the application to intervene is allowed.
A preliminary injunction is to be granted if there is (1) a substantial likelihood that the plaintiff would succeed on the merits; (2) a substantial threat that the plaintiff would suffer irreparable harm if the injunction is not granted; and (3) the threatened harm to the plaintiff outweighs the threat and harm the injunction may do to the defendant. Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980). The court may also consider the risk of harm to the public interest when deciding to issue a preliminary injunction. Brookline v. Goldstein, 388 Mass. 443, 447 (1983).
In regard to the first factor, the plaintiffs have a substantial likelihood of succeeding on the merits. The statutory award process is governed by the competitive bidding statute. This statute is designed to accomplish two fundamental purposes as stated in Interstate *625 Engineering Corp. v. City of Fitchburg. 367 Mass. 751, 757-58 (1975):
We discern two fundamental, complementary legislative objectives underlying the competitive bidding statute. First, the statute enables the public contracting authority to obtain the lowest price for its work that competition among responsible contractors can secure. By binding subbidders . . . and general contractors ... to their original filed bids, the statute encourages them to file their lowest profitable bid in the first instance . . . Second, the statute establishes an honest and open procedure for competition for public contracts and, in so doing, places all general contractors and sub-bidders on an equal footing in the competition to gain the contract. The statutory procedure facilitates the elimination of favoritism and corruption as factors in the awarding of public contracts and emphasizes the part which efficient, low-cost operation should play in winning public contracts. [Citations omitted.]
To ensure that the legislative objectives of the competitive bidding statute are accomplished, our courts have consistently required strict adherence to the statutory bidding scheme. See, for example, Grande & Son, Inc. v. School Housing Committee of North Reading, supra (strict adherence required even where the violation benefited the public).
Other cases have considered instances in which deletions have been made to the scope of work as set forth in the Project bidding specifications. In Grande & Son, supra, the awarding authority awarded the contract to the lowest general contractor but deleted from the scope of work a subbid that had been included in the general contractor’s bid. Although the Court noted that the awarding authority had the right to object to all bids, the Court invalidated the contract award, stating at 258:
If, after bids are opened, the awarding authority could, either with or without negotiation with a selected general contractor, omit portions of the proposed work for reductions in price, the legislative intent to protect the public, all too easily, could be evaded. That the awarding authority, as contended here, had as one of their purposes a reduction in cost is of no consequence. [Citations omitted.] Even the best of motives cannot excuse contravention of the statute.
Similarly, in Sciaba Construction Corp. v. Boston, 35 Mass.App.Ct. 181 (1993), the Appeals Court determined that an awarding authority’s deletion of work from the scope of work set forth in the bidding document was improper:
[T]o allow the awarding authority to rely on the clause in the bid document to change the scope of the work after the completion of the competitive bidding process would, in our view, open the door for manipulation of bids. Accordingly, the city should not have deleted the item. Id. at 190.
The Attorney General’s Bid Protest Decision issued in this case characterized the present situation well:
[t]he deletions condemned and found violative of the bidding law by the Grande and Sciaba Courts were much smaller than the changes to the Project specifications made by Peabody and Charles here. In Grande the change concerned about $20,000.00 for a $1.5 million project. In Sciaba the change concerned the deletion of $960.00 worth of work on a $2.2 million project. Despite these relatively small changes, the Courts still found that the changes violated the competitive bidding statute. Given this precedent, the magnitude of the changes made here, the cited objectives of the competitive bidding statutes, and the Courts’ consistent requirements of strict adherence to this statute, we must conclude that the actions undertaken by Peabody and Charles violated the competitive bidding statute.
In Re: City of Peabody Public Services Facilities, Bid Protest Decision, Office of the Attorney General Division of Fair Labor and Business Practices, April 14, 1997.
“The general rule in this Commonwealth is that failure to adhere to statutoiy bidding requirements makes void a contract entered into without such compliance." Phipps Products Corp. v. Massachusetts Bay Transportation Authority, 387 Mass. 687, 691 (1982). The contract between Peabody and Charles changing the scope of work by deleting a number of items and approximately $2 million dollars of cost substantially modified the original intended contract in violation of the competitive bidding statute as Charles was not awarded the contract on the basis of the original bid. The post-bid “negotiations” in which Peabody and Charles were involved are inconsistent with the concept of competitive bidding which is embodied by the public bidding statute. The contract is in clear contravention of both the letter and the spirit of that law. Thus, I determine that for the reasons stated above the plaintiffs have established a substantial likelihood of succeeding in establishing that the contract between Peabody and Charles violates the public bidding statute.[5]
Charles argues that the plaintiffs are not entitled to injunctive relief because the Bid Protest Decision of the Attorney General made no order other than allowing the protests of Callahan. The finding of the Attorney General that Peabody and Charles violated the competitive bidding statute does not limit the authority of this Court to enter an injunction. General Law, c. 149, §44H permits the Attorney General to seek injunctive relief in the Courts. As discussed above, this statutory provision does not prevent private parties from seeking judicial relief.
*626 Nor does the so-called “change” order entered into between Peabody and Charles save the contract in this case. The “change order” has so altered the original project that it has created a project different from the original one submitted for competitive bidding. Change orders are intended to be a way of dealing with changes that arise during the progress of a project such as site conditions that differ from those indicated in the bid specifications or circumstances that require the awarding authority to stay, suspend, delay or interrupt all or part of the work requests by the contractor. Change orders are not intended to be a method for significantly amending the scope of a project that had been the subject of competitive bidding. See G.L.c. 30, §391. In Morse v. Boston, 253 Mass. 247 (1925), the Supreme Judicial Court recognized the danger of attempting to change significantly the terms of a contract from those which have been the subject of competitive bidding. The Court noted that the public bidding statute protects the public interest by requiring advertisement and competition before the award of public contracts and that such statutory safeguards are intended to restrict the power of public officials to amend or alter public contracts. The Court stated, at 253:
[w]hen a contract is to be modified so as in substance and effect to be made new and different in main aspects, that cannot be done under the guise of an amendment or alteration. It would be a vain thing for the Legislature to establish these safeguards for the public treasury to govern the initial execution of a contract and yet to permit all the evils thus prohibited to be accomplished by amendment or alteration of such a contract when once executed.
Charles advances a laches argument, complaining that the plaintiffs did not act in a sufficiently speedy fashion. It does not appear, however, that the plaintiffs delayed at all. The contract was originally awarded on January 17, 1997. According to an affidavit filed by John J. Spignesi, presently the attorney for C.I.M., Mr. Spignesi met on February 11, 1997 (the meeting) with Daniel C. Doucette, the purchasing agent for the City of Peabody. The meeting was pursuant to a written request filed by Mr. Spignesi under the Freedom of Information Act for inspection of Peabody’s documents surrounding the receipt of bids and award of contracts in connection with the Project. During the meeting and inspection of Peabody’s documents, Mr. Spignesi discovered that the City had renegotiated the scope of the work on the contract and hád entered into a contract with Charles different from the scope of work of the original bid. Upon making that discovery, Mr. Spignesi informed the purchasing agent verbally that the conduct by Charles and Peabody violated the competitive bidding statute. Callahan filed the Bid Protest with the Attorney General’s office on February 14, 1997 which was only three days after Mr. Spignesi’s meeting with the purchasing agent[6] and less than one month after the contract was entered into between Peabody and Charles.
There is a dispute about who Mr. Spignesi represented at the meeting. Mr. Spignesi’s affidavit does not indicate who he represented at that time. An affidavit submitted by the purchasing agent states that Mr. Spignesi indicated to the purchasing agent that he (Spignesi) was representing a bidder for the HVAC and Fire Protection subcontract on the Project. This dispute as to who Mr. Spignesi was representing at the meeting is meaningless in terms of the substance of the meeting. The purchasing agent does not deny that Mr. Spignesi advised him (the purchasing agent) that the bidding process had been unlawful. The City was thus on notice by February 11, 1997 (at the latest) that it had violated the law. Regardless of who Mr. Spignesi represented at the meeting, Callahan filed its Bid Protest only three days after the meeting.
The decision of the Attorney General’s Division was rendered on April 14, 1997 and the complaint was filed in this court on April 16, 1997. There has been no delay by the plaintiffs in this matter. On the contrary, they have acted with great speed.[7]
It is necessary to consider whether there is a substantial threat that the plaintiffs would suffer irreparable harm if the injunction is not granted and whether an adequate remedy at law exists. A general bidder on a public project improperly awarded to another bidder may not recover anticipated profits as a measure of damages, but'is limited solely to recovery of its bid preparation costs. Paul Sardella Construction Co. v. Braintree Housing Authority, 3 Mass.App.Ct. 326 (1975), aff'd. 371 Mass. 235 (1976). In Petricca Construction Co. v. Commonwealth, supra, the Court recognized the importance of granting equitable relief when the statutory scheme has been -violated. The Court stated, at 400:
[m]oreover, the issuance of a preliminary injunction in this type of case is specifically authorized by statute. Although not invoked in this case, G.L.c. 149, §44H, as amended by St. 1985, c. 808, grants to the commissioner of the DOLI [Department of Labor & Industries], or his designee, ‘all the necessary powers to require compliance [with the bidding laws] including the power to institute and prosecute proceedings in the superior court to restrain the award of contracts and the performance of contracts.’ Power to pursue an injunction to enforce the bidding laws is illusory if a private litigant is barred by rigid application of equitable principles. A private litigant, for these purposes, is not distinguishable from the DOLL [Citation omitted.]
As was further stated, at 399: “Such a consolation prize [bid preparation costs] pales in comparison to an award of the contract . . . Without a preliminary injunction, whatever profits . . . may [be] . . . received upon completion of the work [ ] would be lost forever [ ] and could not be recovered in an action at law. At *627 that juncture, bid preparation costs ‘fall [] far short of being equivalent of the potential to win the contract. [Citation omitted.]’ ” The plaintiffs lack an adequate remedy at law. Injunctive relief is necessary not only to assure fair treatment to all bidders involved but to assure public confidence in the public bidding system and to secure the legislative objective of competitive bidding. The courts should act to promote the public interest by compelling a proper award contract for this Project based on full and open competition. Such action is necessary to promote the public’s confidence in governmental agencies and public personnel.
In ruling on the request for an injunction, I must also balance whether the harm to the plaintiffs outweighs the harm the injunction may cause the defendants and consider the risk of harm to the public interest. The public has an interest in having the project completed in a timely fashion. But the public has a greater interest in having its elected and appointed officials properly implement the law. The inconvenience and expense caused by the delay in the construction of the garage is of significantly less importance than ignoring this type of avoidance of the public bidding statute. The interests of the defendant City and the private defendant Charles are of minimal significance as those two parties have entered into an illegal contract. The harm to the public interest and to the plaintiffs clearly outweighs any harm to the City or to Charles.
It is important to the public interest that bid requirements be enforced. “Public agencies that disregard or permit deviations from the prescribed bidding process create grave uncertainty among all interested parties and arouse public suspicion that something is amiss in the selection system. Thorn Transit System International, Ltd. v. Massachusetts Bay Transportation Authority, 40 Mass.App.Ct. 650, 657 (1996) (Brown, J. concurring). "In the arena of publicly bid contracts, the expeditious action of a single justice is often the only way to . .. preserve the legitimate rights of an unsuccessful bidder." Id. at 656-57.
ORDER
The application to intervene is ALLOWED.
A preliminary injunction is to issue enjoining the City of Peabody and Charles Construction Co., Inc. and their respective agents, servants and employees from performing any work on the public building project known as the “New Garage and Office Complex, Public Services, Park, Recreation and Forestry Departments” until further order of the Court.
The matter is advanced for speedy trial and is to be heard within six months of the date of this Order.

 General laws c. 149, §44H as amended by St. 1993, c. 110, §§269 and 231 and by St 1996, c. 151, §386 provides in pertinent part, as follows:
]T]he attorney general [formerly the commissioner of labor and industries] or his designees shall enforce sections forty-four A to forty-four H, inclusive . . . [The attorney general] shall have all the necessary powers to require compliance therewith including the power to institute and prosecute proceedings in the superior court to restrain the award of contracts and the performance of contracts in all cases where, after investigation of the facts, he has made a finding that such award or performance has resulted in violation, directly or indirectly, of the provisions of said sections forty-four A to forty-four H, inclusive . . .

 An application to intervene has been filed by the Associated Subcontractors of Massachusetts, Inc., Titon Roofing Company, Inc. and Beckwith Elevator Company on behalf of various subcontractors. See Mass.R.Civ.P. 24(b) and discussion infra.

 Mass.R.Civ.P. 17(a) provides in relevant part: “[E]very action shall be prosecuted in the name of the real party in interest. . .”

 Pursuant to Federal R. Civ. P. 17(a) which is similar to Mass.R.Civ.P. 17 (a), at least four federal district courts have held that associations of contractors have standing to sue on behalf of their members. See Associated General Contractors of Conn., Inc. v. New Haven, 130 F.R.D. 4 (D. Conn. 1990); Rhode Island Chapter, Assoc. General Contractors of America Inc. v. Kreps, 450 F.Sup. 338 (D.R.I. 1978); Constructors Association of Western Pennsylvania v. Kreps, 441 F.Sup. 936 (W.D. Pa. 1977).

 The plaintiffs argue that Charles may have participated in the engineering and design services. If so, the provisions of G.L.c. 268A, § 1 (q): (“. . . no such contractor or personnel shall directly or indirectly bid on or be awarded a contract for any construction project if they have participated in the engineering or environmental analysis thereof’) may be implicated. Because the contract is otherwise invalid for the reasons I have stated, I do not reach this question.

 There is no indication in the record before this Court that anyone in the public knew anything regarding negotiations between the City and Charles any sooner than this.

 Further, Peabody has been on notice of the illegality of the contract and the challenge to it since at least February 14,1997 when Callahan filed the bid protest with the Attorney General’s Division. Nevertheless, Peabody and Charles continued with the work on the Project. The work also has continued despite the April 14, 1997 Bid Protest Decision of the Office of the Attorney General which declared the contract illegal.